Please call the next case. 4-16-0431 Myron Sims v. Workers' Compensation Commission Counselor, you may proceed. I plead in support. Mr. Works, my name is Bruce Besore and I represent Myron Sims. The arbitrator rejected Mr. Sims' case for an 8-D-1 and instead awarded an 8-D-2. On review, the Commission reversed the arbitrator's 8-D-2 and issued a denial. The Circuit Court confirmed. This appeal is based on a Commission decision that appears to be in conflict with itself, is in conflict with the law, and is in conflict with the facts. I'm going to ask that this Court remand the decision to the Commission. I also want to note that failure to prove up a wage difference doesn't mean there's a denial. In fact, the default award would be to an 8-D-2. That's what the arbitrator awarded, and under this evidence, if an 8-D-1 isn't appropriate, an 8-D-2 would be. Now the first error of the Commission was in its first finding in the first paragraph of the decision. The Commission wrote, The Commission finds while Petitioner complied with one end, Petitioner failed to prove he sustained an occupational disease which has become aggravated and rendered disabling as a result of his employment, and he failed to prove there's a cause of connection between his current condition of ill-being and the exposure on August 29, 2007. Now, it's impossible for Petitioner to have satisfied Section 1-F, yet not proven a work-related disease resulting in disablement within a two-year period following his date of last exposure. That's the definition of 1-F. Therefore, the decision is flawed in at least two ways. First, it is an irreconcilable conflict with itself. You can't have no disease and no work-related disablement and still satisfy Section 1-F. Second, assuming the Commission panel had a purpose in mind when it wrote that sentence, that purpose must come from a misunderstanding of what causes occupational disablement under the Act. And here I'll give a little latitude to the Commission. I'm not being as critical as it may sound. They hear one disease case for every how many injury cases. And if you put on your injury hat to analyze a disease case, things aren't going to match up. And I think that's what happened here. This case in particular is a type of case that begs for this kind of error by the Commission to be made. Petitions only claiming one disease, CWP, and errors by the Commission regarding either or both the medical facts of the disease of CWP or the case law concerning CWP can result in a decision like this one. Considering CWP to be a non-disease, a disease with no consequence, that's a big mistake that sometimes is made. But this Court put that to rest in the case of Freeman Cole v. the Commission, a case involving the same respondent, the same counsel for respondent, and oddly enough a minor with the same name, Sims. It was published in 2013 and has been cited by this Court again in numerous decisions since that time. The Court found in that case it's uncontroverted that CWP is a tissue reaction in the form of scarring or fibrosis. It causes a reduction in useful lung tissue. It's progressive. And the only treatment is to remove the sufferer from any further exposure to CODA. That case stands for the fact that once a claimant has established that he suffers from CWP, he also has satisfied the statutory designation of disabled as a matter of law. And the universal testimony in this case conforms with every line of that 2013 case. What did Dr. Cohn say about CWP? He said he had it. Sorry to be so brief. Well, Cohn, Smith, and Anderson obviously found the claimant to be positive for CWP, but what do you make of the testimony of Drs. Wyatt and Rosenberg? They came to the opposite conclusion, didn't they? No, they did not. What was their conclusion? This is the essence of the case. And you have to look at their testimony as well as their bereading report. What you have is three bereaders saying he does have CWP. You have the two bereaders you just asked about saying we can't say he doesn't have it. They can say they don't see it on the X-ray, but they admit they can't say he doesn't have it. So, therefore, I say there are three positions on this chessboard. One is he has it. Then these people say we can't say he doesn't. And then there's he doesn't. This one appears nowhere in the record. And what we have is a weighing of the evidence, and that's the burden of proof. And under this burden of proof, I don't know how you get to no disease when nobody said we can prove he doesn't have it. Did Wyatt say that, or did Wyatt say he found no evidence of CWP on the films? Oh, he said that. But he also said that you can have CWP with a negative X-ray, which is true. So, I mean, it's just the nature of the disease. You have pathologic changes, tissue changes, as was referred to in the 2013 Sims case, and those create shadows on the X-ray. Or maybe they don't. When the bereaders talk about that X-ray, they're only saying I saw the shadows. Now, if they say I saw the shadows, he has it, that's sufficient for a positive diagnosis. If they say I don't see the shadows, it doesn't mean he doesn't have it. It just means they didn't see the shadows. He still could have it. And, in fact, in the testimony, you'll see that at autopsy, many more minors are found to have CWP pathologically than are found to have it by X-ray during life. It's tough and it's easy. There's nobody here that says I can prove he doesn't have it. There are three guys that say he did. Next, the commission relies heavily on the four NIOSH B readings in the record. This is reversible error as a matter of law because none of those B readings are relevant. Respondent even stipulates that at page 33 of its brief. It said, quote, Mr. Sims was correct that none of the chest X-ray interpretations by NIOSH could prove that he did not develop CWP after the last NIOSH X-ray, which was taken on May 8, 2007. And this is an error that repeats itself in many of our cases. NIOSH X-rays are for purpose. While that guy's working in a coal mine, they want to figure out if he's got it or not. Whether they're right or not in their X-rays is not the question. The legal question is, did he have it within two years after he left the mine? And all these X-rays are taken before he left the mine. In this case, the most recent NIOSH X-ray was two years and three months before the date of the only legally relevant question, which is, did he have CWP on August the 29th of 2009? And even respondent stipulates that he could have gotten it in that time. Then what is the purpose of introducing NIOSH X-rays if indeed it's not legally relevant? Well, I think maybe the person wants to build up a fat record. Maybe he wants to put a fastball under the chin of some triers of law and fact. I think that they shouldn't be in there at all. Is it worth an objection, right? I have in the past, and it's never worked. Plus, I don't object every time something may not be able to come in. I think it speaks for itself. So it's the bottom line in all candor, Mr. Ussor, in this case you didn't object to them coming in? Yes or no? I can't tell you I did not, but I can tell you I did. I don't know the whole record, and I do some of these cases, and I have, and I may not. However, whether I objected or not doesn't change their relevance. If I didn't object, they came in. What came in? Irrelevant evidence. Well, what about the argument it goes to the weight, not the admissibility of the evidence? You're saying that these things are outside the parameters, so they should be entitled to no weight? Why is it necessarily automatic error? Well, it's error because if I had an x-ray of my leg two years ago and it was just fine, that doesn't mean I didn't break it today. And if I had an x-ray of my lungs three years ago and you couldn't see the CWP on them, it doesn't mean that I don't have it today, the relevant day. And most importantly, on page 33 of this brief, respondents stipulate it to that. Can I ask you a question? If one doctor testifies, oh, in my opinion, this man had a broken leg because I looked at the x-ray and I saw the break, and the other doctor said I looked at the same x-ray, there was no break, does that mean he didn't have a broken leg? That case would, but that's not the case I propose. Why not? I propose that two years ago there was an x-ray of the leg and the guy said it wasn't broken. Today, after I fell, we take another x-ray and the doctor says it's broken. That x-ray is two years ago. It doesn't mean anything today. The x-ray of the lungs two years ago, three years ago, doesn't mean anything today. But this is on a NIH expert. You're not talking about Wyatt and Rosenberg. I'm talking about Wyatt and Rosenberg. Okay. And how is it different, my example, from exactly what happened in this case? One guy says he's got COPD because I saw it on the x-ray, and the other doctor said I looked at the x-ray, there's no evidence of COPD there. That leads to the logical conclusion that doctor concluded, and he did, that he doesn't have CWP. You have to go one step further. And I understand why you're asking this question because as evidence develops over time, as I get better at it, as Ken gets better at it, as our understanding of disease gets better, what you're looking at changes. The animal changes. We know now, and this question has been coming up for about five years, we know now that if I ask that question, does your negative x-ray mean this man does not have CWP, the doctor is going to say no, it doesn't mean that. Never asked that question more than five years ago. I do now. The law should change. The decision should change along with that changing testimony. Because you get to the relevant question is, does he have it? And it's a light switch. It's on or off. You've either got it or you don't. I put forward my case. I prove he does. Then respondent puts forward its evidence and the question is, does it prove he didn't have it? Because I proved he did. I got B readers. If all you've got is my evidence, I proved he did. Now, when I prove he did and they come up and say, well, we can't prove he didn't, I think it's a very simple analysis that he's got it. I've got more evidence than the other guy. They both opined that he didn't. They said it was their opinion he did not have CWP. Now, you may be attacking that opinion, but the fact of the matter is it's there. And you don't like the basis. No, sir. I'm attacking their testimony, which is exactly what they said in their testimony. Did they both opine that he does not have CWP? That's not what I said. No, I asked you the question. Did they opine that he didn't have CWP? No. They didn't say that? No. They said he didn't have it on the X-ray that they saw. They said they opined that he didn't have it. Why? Because I looked at the X-ray and there was no evidence of it. That's what they testified to. That's all the further they can go. And in their testimony, they didn't go further. To their credit, they didn't lie. They didn't push the envelope any further than it should be. They can sit there and tell you, I looked at the X-ray and I saw no evidence of CWP on the X-ray. Then you ask them a few questions and they say, but that doesn't mean he didn't have it. Now, does that stack the deck in my favor? Well, for once it might. I don't know. But there are issues in which the respondent's got the deck stacked in his favor. But beyond all that, it is the truth.  I couldn't see it on the X-ray. Then I asked them the question, can you have it on a negative X-ray and still have CWP? Yes. Their X-ray did not rule out CWP. Now, the commission ignored the testimony of respondent's experts on what it considered to be the most important fact of the case, that Dr. Rosenberg reviewed medical records and Dr. Cohen didn't. But what Dr. Rosenberg testified that the records did tell him was that the petitioner has chronic cough, that the Social Security records have multiple entries stating he has chronic cough, that at the time of Dr. Cohen's exam he was taking breathing medications, albuterol, serevant, and QVAR. What the commission didn't say that it took into consideration was that Dr. Rosenberg saw the records, but he didn't see the petitioner. He didn't examine the petitioner. So he wasn't able to take a patient history and learn the specifics about what happened when he was covered up with rock dust on that incident in the mine. Why did the records say he's exposed to diesel exhaust? And that's not good at the mine. He wasn't able to do those things because respondent decided we don't want an exam. We just want a records review. Now, when it came to the only thing that Dr. Rosenberg did of relevance in this case, his B-reading, the commission clearly ignored the testimony of Freeman's B-reader radiologist, Dr. Wyatt, on treating records and B-readers. Here's what he said, quote, When you take the B-reader exam, you don't know anything about the patient. Personally, I prefer to not know anything about the patient. I don't want to know about his pulmonary functions. I don't want to know how long he was exposed. And for determining radiographically significant CDFP, the preference is not to have any medical records. Given this testimony about Dr. Rosenberg's lack of a personal examination, combined with a testimony about the lack of relevance of medical records to a B-reading, the decision of the commission to give more weight to Dr. Rosenberg has no foundation in the evidence. The commission's failure to consider this testimony of both Freeman's experts on this matter is grounds for reversal. And here's where I'm going to come back and ask you if it's time to clear this up, just as when... Excuse me. You have time in this block. Thank you, counsel. Counsel, you may proceed. May it please the court, Mr. Lesore, good morning. Welcome back, Justice Hoffman. The last time I was here, you were on assignment elsewhere, I think. Let me... It happens. It happens to me. Can you go right to the issue that we're asking about the B-reader and the x-rays and the conclusions that cannot be made? Sure, absolutely. That's where I was going to begin. In regard to the issue of whether pneumoconiosis is pregnant, Mr. Lesore argued that chest x-rays aren't important, don't need to look at them, we shouldn't be balancing the evidence based upon those findings. He submitted nine interpretations for a piece of evidence, apparently, that doesn't have any probity.  There were nine positive readings of this gentleman's chest x-ray. There were ten negative readings of this gentleman's chest x-ray. Those are all from the retained readers. In regard to your question, Justice Holdridge, about what's the importance of NIOSH readings, the importance, and it's highlighted in this case, is that the last NIOSH reading that was taken of this gentleman was on May 8, 2007. He retired on August 31, 2007. So we're talking four months. Two B-readers by NIOSH read that film as negative. They're independent. They're not retained. They're simply trying to read the x-ray and get it right. You would have to make a reasonable assumption that in that ensuing four months, he then developed pneumoconiosis while he hadn't done so over his entire working career. The evidence is that simple pneumoconiosis does not progress once the exposure ceases. So more likely than not, if he didn't have it that last day he worked, he didn't have it. He didn't develop it later. Then what's this two-year window for? Well, the two-year window is actually the 1F window, Section 1F, to be able to prove disease within – well, actually, and it has to be disablement, not just disease, but he has to prove disablement. But if you have CWV, do you prove disablement? No. No, I don't believe so. Okay. We have a case that indicated it was disablement? I'm sorry? Didn't we – isn't there some case law precedent that says it is? Isn't the existence thereof disablement? It's my position. It's not – and that's why I cited – or I actually put in the beginning of my brief, Section 1E, which is the definition of disablement in the Occupational Disease Act. I think we all are stuck with that. We have to meet that definition in 1E for there to be disablement. If a man has CWP, can he ever go back to work in a coal mine? According to the American Thoracic Society, he can. We have testimony from every one of these experts that says if you have CWP, you can never go back to the coal mine. I think the best practice, if anyone has a pulmonary disease, would be not to have further exposure to what caused it. There's no dispute about that. But the position of the American Thoracic Society is that an older worker with a mild pneumoconiosis may be at low risk for working in currently permissible exposure levels until he reaches retirement age. The Mine Safety Health Administration, which is charged with the health of these miners, if they have a positive – if this gentleman had a positive chest X-ray, that May 8, 2007, had been positive, he would have been given a dust letter that he can then present to the mine. The mine then has to move him to an environment, if he's not already in it, of what's called the REL recommended exposure level, which is lower than the PEL, which is the permissible exposure level that all miners have to work in. So MSHA themselves do not remove the miner from the mine. But they give him the option to be in an environment with less dust. I want to finish the questioning about NIOSH. In this case, that May 8, 2007 film was read by 2B readers from NIOSH as negative. The other thing that's significant about that is that of the nine positive readings by the retained experts of this gentleman's chest X-ray, five of them predated May 8, 2007. If that interpretation by those two separate B readers of that film, taken May 8, 2007, is correct, then five of the interpretations that were positive for films prior to that time are obviously in question. And that's why – the other reason why those NIOSH interpretations are important and provative. I think that there's no question that there's sufficient evidence in the record that this gentleman does not have pneumoconiosis. Mr. Besore wants to argue, well, it's possible, even with all the negative readings that he's got pneumoconiosis. True. It's possible. It would be proven if there was some pathologic evidence of pneumoconiosis. That's what he's talking about. There is no pathologic evidence in this case. So the choice is between a possibility or what the preponderance of the evidence shows in this case. And I think clearly the preponderance is based upon the chest X-ray interpretation that this gentleman does not have pneumoconiosis. Is there any way you can get pathological evidence of lung removal or biopsy? Well, or biopsy. And we don't do that. We don't do that. Well, that's what I'm saying. In a lot of cases it's autopsy or lung removal biopsy. People have biopsies of lung tissue. If they're exploring a nodule that's suspicious, often a biopsy is done. And if there's enough tissue there, then we can tell by looking at that tissue as well. But that's not here. So we're talking about a possibility. An award should not be made based upon imagination, speculation, or conjecture. It is just conjecture here. It's a possibility. I think opposing counsel is saying the opposite. Well, opposing counsel believes all coal miners have black lung. If you rent mine, you have evidence of black lung. We just haven't done the studies that will show it. And my parliaments prove it. What do you make of the argument? He seems to be saying, Mr. Washore, that Wyatt and Rosenberg interpreted the X-rays as showing no evidence of CWP. But that's not the same as saying he didn't have it. Are we parsing words unnecessarily? I think so, and I think we're talking about the same thing here again. Dr. Wyatt, you have his credentials. The man, I couldn't tell you how impressed I am by him as a person. He was asked, can you have a colmacule, which is the core lesion for the definition of co-workers in meconiosis, that speck of dust that has some scar tissue around it. Can you have that and it not have shown up on this chest X-ray? And he said, yes. And that's true. The problem is we don't have any evidence of that in this case, that that is there. And we know that not all individuals who are exposed to coal dust develop the disease. It is something that you have to be a host for. We don't know why some people do and some people don't. But he's very honest, and I would suspect that my other experts that were asked the same question were just as honest. No, an X-ray does not have the clarity of actually having lung tissue under a microscope. That's true. Did I answer your question? Yes. Okay. In regard to, can I move on from the X-rays? Are there any more questions about those? Okay. In regard to the issue about chronic bronchitis, Dr. Rosenberg in this case, who is my retained expert, attributed the same to his use of an ACE inhibitor, which is for hypertension. And his smoking, which by the way, he maintained that habit up until the time that this case was chronic. But set all that aside, as Mr. Ressort pointed out, he had his client examined by Dr. Cohen. Dr. Cohen took a history from this gentleman with this claim in mind. I mean, that's why he was seeing him. He took a thorough history from him to flesh out all his symptoms. It would be part ultimately of his diagnosis in the case. He testified that based upon the history he took from this gentleman, he did not meet the diagnosis of chronic bronchitis. So he criticized me for not having Dr. Rosenberg examine him. I think that his thorough review of all medical is certainly of great value here. But the one who did, his expert, said he doesn't meet the diagnosis of chronic bronchitis. That is sufficient evidence that he does not have it. It comes from their own expert. You can look, though, at the medical. I put in medical from Prairie Cardiovascular, the Springfield Clinic, and the Springfield Clinic Eye Institute, which you may wonder, why on earth did I do that? But that had a history of his symptoms. The last medical of Prairie Cardiovascular, January 10, 2008, where his pulmonary symptoms were charted. And this is, again, after he left mine. He denied chronic cough. And you can look in the record. That's the very last medical from him where that system is examined. The Springfield Clinic, February 7, 2012, was the last time his respiratory system was charted. That's almost five years after he left the mine. No chronic cough. The Springfield Clinic Eye Institute, the last time that his respiratory system was charted, September 3, 2010.  No shortness of breath or cough. It actually is consistent with what Dr. Rosenberg said, that he does not have chronic bronchitis. What are we to make of this statement in the arbitrator's decision that respondents, experts, had a financial interest in performing the examinations, which goes to the weight of their opinions? Justice Hoffman, that is present where? In the arbitrator's opinion. In the arbitrator's opinion? Yeah. Oh. Well, I don't know what to make of it, to tell you the truth. Neither do I, because in almost every workers' compensation case, there are paid experts on either side. Right. So we should discount their opinions? I guess that's what she was wanting to say. Is this a new arbitrator? Yes, she's no longer an arbitrator. She was a new arbitrator at the time, Your Honor. And I cannot recall, this may have been one of her first cases, but no, she was an arbitrator for a couple of years, I'm going to say, Mollie Dearing. Justice Moore, you wouldn't argue with the fact that it is relevant, or can be relevant, and weighed by the prior effect, how much an expert is paid, how much they charge per hour. I mean, that is fertile ground in cross-examination in any case involving a retained expert. So if the commission here, in its decision, was saying that that is not to ever be considered by the prior effect, that would be an incorrect statement of the law, wouldn't it? I think it's an entirely appropriate area. The commission, in fact, made a notation, made a finding, that Dr. Cohen testified for Mr. Wysore's firm 20 times a year on average for the last God knows how many years. This Court may be familiar with both of these. What about the second and third issues that were raised on disablement? In regard to disablement, the spirometry, my time is almost up, the spirometry was normal, so there was no obstruction. The lung volumes were normal, so there was no restriction. The resting blood gases were normal as well. What was abnormal was a mild reduction in the diffusion capacity. Dr. Cohen attributed that to pneumoconiosis. If this gentleman doesn't have pneumoconiosis, that opinion falls. Dr. Rosenberg, in looking at this gentleman's medical, saw that he had a genetic condition. He had a hypercoagulable state, which means his clotting factors were elevated, which is a concern because that can lead to clot and stroke and those types of things. So he was on a chronic regimen of Coumadin. Coumadin in long-term use can cause extravasation into the small capillaries, and we get a lot of them in the lungs. And that can result in some damage to the lungs. And it's interesting here, and Mr. Bussor mentioned, Dr. Wyatt doesn't want to know anything about these people. He assumes that they have enough exposure to have pneumoconiosis, but then he just looks at films. He was an incredible diagnostician. I mean, he really was. He would see things on films and tell me something about the patient. It would just blow me away that he could get that from a chest image. In this case, in looking at this gentleman's films, one of his differential diagnoses for some stranding that he saw was that he may have had long-term Coumadin usage, which is exactly what it turned out to be. And he did that from looking at this gentleman's film. That is associated with mild reductions in diffusion capacity. But finally, in regards to the issue of disablement, Justice Holdridge, we know why this gentleman was disabled. He filed a claim for social security disability on the heels of leaving the mine. At that point in time, self-interest dictated that he be complete in advising the Social Security Administration of what his disablement was due to, his symptoms, his causes, the problems he had. He does not list a pulmonary disease or a pulmonary problem for his disability. He told us the cause. Thank you. Thank you, Counsel. Counsel, you may reply. You said in your original argument that the commission's decision was internally inconsistent because they said that the petitioner complied with Section 1F but failed to prove that his claim falls under 1D, 1E. Is that correct? I said that they said that he complied with 1F, but then they found no disease in disablement. Right. So those two things can't live in the same house. Why? 1F sets the two-year time period. One can easily interpret this to say we find that he filed within two years, but he didn't establish that he had a disabling disease. Justice. 1F has a two-year time period, doesn't it? 1F, a two-year time period, for what? To just stop for two years means nothing. Two years, you must show disability. Would you be satisfied if they would have said, we find that he complied with the two-year period in 1F but failed to comply with the requirement that he prove he had a disabling disease? Would that satisfy him? Absolutely not. They have to say, if you comply with 1F, you found disease, you found disablement. Otherwise, 1F means nothing. What did you prove in two years? Nothing. So they are internally consistent. And I think as you go through the rest of the record, you'll see that's not the only internal inconsistency they have. Did he file within two years? Pardon me? Did he file within two years? Well, he filed within three. I know that. But filing in two doesn't make any difference. What does 1F say? It has to be filed within two years of last exposure? No, sir. What does it say? 1F means that you must prove there was disablement within two years from the time he left mining. And that proof can be after two years. You just have to prove that he had disablement within two years. That's 1F. Not when you file it, that you've proved he has some disablement, which naturally means he's got the disease, within two years from the day he left the mine. All right. Now, first of all, the counselor got up here and started talking about chronic bronchitis. It's nowhere in the record. We didn't ask for it. They didn't find it. Why is he talking about chronic bronchitis except to throw you off the track? Nobody said he has it. Now, everybody said he has chronic cough. Cohen and Rosenberg said he has it. And respondents stuck, I think, with the opinions of its experts. Can't come up here and start re-weighing the evidence and say, well, on this date he said he didn't have chronic cough. Rosenberg said he did. Next thing, he was asked if we're parsing words here on some of what we do. Well, for good or for ill, that's my job. I think for good or for ill, that's your job, particularly when it comes to diseases. That may be a little bit more difficult to work with. So, yes, we are. And I'm asking you to put specific definitions on some foggy terms. Counsel here tries to ignore, when you look at his brief, ignore, and you asked him about it, tries to ignore the 2013 Sims case where you have said, if you've got CWP, you have disabled as a matter of law. And instead cites the 1993 Hicks case, saying, well, just because you have a disease doesn't mean you have disabled. Well, that's 20 years has passed. The testimony's passed. We've learned more about it. And the Sims case of 2013 has come out. I think it's improper to cite that wrong case. Just like it's improper to cite the Dawson case and say, oh, he can't have an AD2 because he didn't do blah, blah, blah, which do apply to AD1, but not AD2. And I listed those, I think, when I was up here the first time. Wrong case recited here. Also, on direct examination of its witness, counsel asked him, doesn't the American Thoracic Society say that an older worker can work with minimal risk until he retires and permissible dust exposure levels? The guy says, yeah. I come back and cross every single time and say, doctor, in the same paragraph, the last sentence, doesn't the American Thoracic Society say there is no safe level of exposure for someone with CWP? They say yes. And I ask you here about parsing and sincerity and getting you off the record, tied into that chronic bronchitis argument. It's wrong to do that. It's misleading. Just like this court broke through with what is CWP and what's disabled with CWP, in the Sims case in 2013, it's time to address the petitioner's burden of proof. In a case where the red light's on or the red light's off, he has CWP or he doesn't. And I propose that when you have three B readers saying he does have CWP, two readers from the other side not saying he doesn't have it, saying he could still have it. But we can't prove it. I think the preponderance of evidence goes to the petitioner, and it's just applying the law to those medical facts. On that Cohen remuneration question that was asked, I think the commission gets to choose whatever it wants to, to decide whether it's biased or not. However, it doesn't get to make things up. And it gave itself an excuse on talking about Cohen's remuneration. It said, oh, it's part of his pay. There's no proof in the record of that. There's no proof that he didn't do it on his own time. There's no proof that if he didn't do that, he wouldn't have been seeing patients. And that's what I object to. And that kind of speculation is carried on throughout the decision. I ask that you reverse and remand to the commission. Thank you. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement. The written disposition shall issue.